Daniel E. Fitzpatrick, J.
If, as Tom Paine has noted, there are times that try men’s souls, there are also cases which try a Judge’s sense of justice. The word “ case ” is used deliberately to confiorm to popular legal usage. Although, Quiller-Couch warns us, we cannot thus properly speak of “ the case of Mr. Jones or Mr. Smith”, unless we refer to the cases in which those gentlemen will ultimately be buried. So much for the purists.
In the matter litigated before us there are elements which urgently cry for judicial succor, if not rectification. Nonetheless, we must remind the parties that the powers of the Municipal Court are limited. As a creature of statute it may not exceed the orbit of the legislative leash. Within this circumscription we do what we can.
The plaintiffs sue in negligence to recover for property damage arising from the following facts: As tenants of the defendant they occupied one of the apartments on a lower floor. The defendant owns and operates a large, high-rise multiple apartment house development. In the plaintiffs’ apartment, there occurred, on two occasions, a backup of sewage. The plaintiffs, who were absent each time, returned to their abode to find the floors and carpeting covered with excrement and filth. The defendant was duly notified of the first occurrence. The plaintiffs, parents of a child of tender years, were understandably concerned. Upon the happening of the second occurrence, receiving no satisfaction, they commenced this action. The plaintiffs would seem, therefore, to have made out a cause of action on both actual and constructive notice of the condition about which they complain.
The difficulty with the plumbing system of the apartment house of defendant seems to stem from the inadequacy of the waste line. The defendant’s defense is not only one of no negligence at all, but that if negligence can be spelled out it is not responsible because it has been compelled to maintain, the situation complained of by force of command of the State Division of Housing. The outline of their position follows: Since the apartment house building was constructed with and financed by State funds under the Public Housing Law, they notified the State Division of Housing and Community Renewal of the condition and requested instructions. They were told by some genius to provide a “ tell-tale.” This, the court is informed, is accomplished by inserting a piece of pipe in the waste line at a point anterior to the entry of the waste pipes from the various apartments. This pipe extrudes to the exterior of the building and if there is an impending backup a “ tell-tale ” drip will give *131 warning. They did this. Further, they instructed their superintendent and his assistants to keep the tell-tale under observation. At the first sign of any waste dripping therefrom, they were to sound the alarm. Since we live in a civilized society with its concomitant complexities and contradictions, it is no surprise to this court that a City Health Inspector, upon discovering the existence of the tell-tale, ordered it removed as a menace to public health. The defendants asked of the Health Inspector what they could do to correct the condition. He replied that the Administrative Code of the City of New York made no provision for such a situation. Such are the consequences of concurrent and overlapping jurisdiction. The defendant appealed to the State Division of Housing, which directed it to comply with the City Health Department’s order. The tell-tale was removed. Then followed the resulting calamity in the plaintiffs’ apartment.
The defendant contends that having done everything within its power to correct the condition and having complied in all respects with the Administrative Code, which it was informed authoritatively makes no provision for such a situation, it cannot be guilty of any negligence. It urges if it is continuing an undesirable condition, it is not doing so willfully, but on the contrary, unwillingly, by direct command of the State Division of Housing and the City Department of Health. Consequently, it maintains it should be absolved from any guilt. If this be correct, plaintiffs would seem to be without any redress. Having been weaned on the tradition of the old common law that there is no wrong without a remedy, this court will take a longer look at this defense. That one, under color of law, can compel another to maintain a nuisance to the detriment of an innocent third party, must shock the conscience not only of the Chancellor, but also of this court. The weak should not do the bleeding while the strong struggle. For if this defense be sound, bureaucratic arrogance has reached a peak and remedial legislation is needed to cure the nuances of the Administrative Code; although a strict diet has been suggested as more appropriate to that obese compendium.
Counsel have not aided the court by submission of any briefs. Independent research has provided the lighted candle in the outer darkness. In Bacon v. Boston (154 Mass. 100, 102) the court said: ‘ ‘ the Legislature may authorize small nuisances without compensation, but not great ones ”. To place what occurred in the plaintiffs’ apartment in the category of a small nuisance is to force the camel through the needle’s eye. The higher courts have consistently held that to justify an act that *132 would constitute a nuisance under color of authority, without making compensation therefor, requires clear and unequivocal statutory sanction. This must be expressed in the act itself or given by unquestionable implication from the powers expressly conferred. (Ackerman v. True, 175 N. Y. 353.) One cannot, by alleged right of higher authority, subject another to a burden in the nature of a servitude in their favor which seriously impairs the value and enjoyment of that other’s property. (Cogswell v. New York, New Haven & Hartford R. R. Co., 103 N. Y. 10.) There is no proof in this action that the State Division of Housing has any such power, express or implied. The record is barren of any proof that the defendant exhausted its remedy within the State Division of Housing or took any legal action to have the determination of that agency reviewed. Supine obedience to the order of the Housing Inspector must carry its consequences.
An inquiry by the court as to what else, if anything, the defendant had done to avoid a recurrence of these obnoxious events brought a reply which, if not clever, had a touch of the unique. It answered that it had asked the women residing in the various apartments to watch for any sign of a backup in the waste pipe. This, it instructed the ladies, could be done by keeping a close eye on the bathtubs and, upon the first indication of such a condition, to immediately telephone the superintendent or other employee to report the emergency. If, as Swinnerton records, James Joyce, because of his authorship of Ulysses, was called ‘1 A master of the eloacle ”, this defendant seems bent upon making the female residents of this apartment dwelling “ mistresses ” of a like order. Consider the result. At the first sign of sewage in the bathtub one can well imagine the strain on the telephone wires as the women watchers all rush to report at the same time; the consternation if the warning call is unanswered, or if neither the superintendent nor any other employee can be found to respond. Panic is inevitable, unless one of these ladies has been a Camp Fire Girl and has some skill in smoke signals. Should such an eventuality not come to pass, the long watch must continue. The asininity of this proposal could only be equalled by the monotony of the task imposed. If taken seriously, these young housewives would be condemned to the narrow confines of the bathroom for an indefinite term, sentenced to detect the first tell-tale signs of backing sewage. Like the sentinals in the Agamemnon, they must keep a constant guard, unrelieved by the broad vistas of the Greeks. The end result could only be to reduce these women to goggle-eyed zombies, unresponsive to the embraces of their husbands *133 and impervious to the pleas of their offspring. One can readily foresee the steep decline in the number of future dependent tax exemptions and a drastic reduction in the next census figures, leading to unbalanced budgets, economic crises and layoffs in the diaper industry. With such a paralysis of family life, the foundations of our Nation would totter, a creeping bureaucracy would have achieved within our gates what an alien totalitarian ideology could not. We must ask the question: Is this the manner in which finis is to be written for the last great hope of earth? This court can accept, that in the realization of any great vision there is compromise and loss. But, that mankind’s arduous climb up the evolutionary ladder from pre-Cambrian chordate to Homo sapiens should end in a ridiculous zombiism created by bureaucratic fiat, is too tragic to contemplate. Mutations of this sort, while not impossible, ought not to be artificially stimulated. This court will not readily assist in pouring three billion years of evolution down the cosmic drain. Nor should it permit the soul of man to be squeezed in a vise, the jaws of which are the ukase of bureaucracy and the stony silence of the Administrative Code. The combination may prove too much for us. Here is a clear and present danger, and if, as enunciated by the late Mr. Justice Cabdozo: “Danger invites rescue” (Wagner v. International Ry. Co., 232 N. Y. 177, 180), we may not hesitate. This court will strike a blow. Mankind must once more be on the march, its banner held high, shouting: ‘1 Death to Bureaucracy ’ ’ and “ Zombies go home.”
Judgment for the plaintiffs.*

 This decision was not filed as the action was settled between the parties.